**Conrad D. JENNINGS, (Plaintiff) Respondent,**

v.

**Ruth Constance JENNINGS, (Defendant) Appellant.**

No. 31587.

St. Louis Court of Appeals.

Missouri.

May 19, 1964.

Charles A. Sheehan, House Springs, for appellant.

Thurman, Nixon & Smith, John W. Thurman, Jeremiah Nixon, Hillsboro, for respondent.

R. KENNETH ELLIOTT, Special Judge.

This appeal resulted from a judgment granting the plaintiff-husband a divorce and custody of the infant daughter.

The parties were married December 5, 1942, and lived together as husband and wife until the separation on July 29, 1962. A daughter was born to this marriage on July 18, 1958, approximately fifteen years and five months after the date of the marriage. On the date of separation plaintiff took the child with him, and filed his petition July 30, 1962.

Defendant filed answer and pleading denominated "Cross-Bill", in which she prayed the court for a judgment of divorce against the plaintiff and for custody of the aforesaid infant child.

Plaintiff testified that the first difficulty with the marriage occurred some ten years before the trial, upon the occasion of a dinner party, at which affair one Johnny Bailey, a teacher of the high school, was a guest. After dinner, and a few drinks afterwards, Bailey started to go to the bathroom, and the defendant followed him in spite of plaintiff's calling to her to come back. Plaintiff remained alone with other guests upstairs, and eventually the defendant came back.

Some time after the parties moved to House Springs, Missouri, they established a charge account at a local store and at the end of each month plaintiff would settle the bill. Plaintiff testified that defendant would run back and forth to the windows, look toward the store, and say, "Yeah, you old baldy, I can get somebody better than you!" Defendant also said at other times she could get somebody better than plaintiff any day she wanted to.

Defendant accused plaintiff of not mailing letters to her relatives for her, and constantly accused plaintiff of running around with other women.

It appeared that plaintiff in his capacity as a high school biology teacher also had the task of being ticket-taker at the basketball games and other duties around the school that required many nights away from home, and when plaintiff would come home from these occasions defendant would accuse plaintiff of running around with a girl friend, which accusation plaintiff denied.

Upon another occasion plaintiff was engaged at home in studying and preparing grades. Defendant started dropping china cups and saucers, one at a time, on the floor, breaking almost the entire set of china. Plaintiff admitted that defendant had been a clean housekeeper, but during the last two or three years she was not, which condition he attributed to the fact that she spent so much time chasing after the little girl that she didn't have time to keep the house clean.

The testimony of plaintiff set forth that about the time the little girl was born he bought a new rug, and defendant would give the child cookies and milk and set her in front of the television and let the baby wet all over the rug, which condition became so acute that the plaintiff and a neighbor took the rug out to the garage and scrubbed it and let it air for two days, and replaced it in the home, whereupon the rug still smelled, after which it was necessary to throw it away. A new rug was purchased a year before the hearing, and plaintiff claims to be the only one who ever vacuumed it. He claimed that the closets had not been cleaned in three years, the utility room was full of junk, and that defendant would let his shirts stack up until mildewed.

About three years before the separation plaintiff had a summer job at the Missouri Pacific Hospital. Required to arise about 5:30 a. m., plaintiff testified that defendant would awaken him by spitting in his face, and upon a later repeat of this procedure in the process of awakening, he swung and missed her, hit the wall and broke his finger, and that defendant always griped because she had to get him up to go to this early work, and because of her opposition he was tardy on four occasions and lost the job. Defendant's excuse to plaintiff was that she did not want to awaken the child.

Plaintiff further claimed that defendant made sexual demands upon him at times when he had final examinations and report cards to put out or had to work late for a test the next day. At such times plaintiff testified that defendant would jump out of bed and inquire if he was coming to bed, and after his reminder to her that he was required to get the tests ready, she would state, "If I had a knife, I'd cut your throat. I'd kill you—bang-bang!"

Plaintiff testified that the child was never permitted on the floor to crawl, and never learned to crawl; that defendant was afraid the child might catch cold, get dirt on her hands, and that she was kept in a playpen until she was almost two years of age; that defendant constantly ran after the child and would take toys away from her, being afraid that they might pinch her. Upon one occasion plaintiff brought the child a toy upon which the child cut her thumb, and the defendant accused plaintiff of buying the toy with the plan of cutting the child's hand.

Plaintiff further testified that at the age of three the child could not put on her pants or socks; that defendant was overprotective of the child; fed her baby food until she was three years old; never permitted her to play with other children; that upon one occasion defendant requested plaintiff to take the child to the doctor because the child "must be crazy or something" since the child had played out in the yard in the hot sun for three hours.

Upon another occasion plaintiff was reading some stories to the child, lying on the child's bed with her. Defendant came into the room and accused plaintiff, in front of the child, of trying to rape the child.

Defendant further refused to allow the child to have a birthday party when she was five, or to bake a cake, because defendant did not want little brats in the house.

While on the way back home on one occasion, the child wanted to stop by the little cousin's house; and upon defendant's refusal the child cried during the 54-mile drive home, pleading with her parents, and at one point threw her arm around the plaintiff's neck and asked him, "What's wrong with me? Why can't I play with other children?" This precipitated the separation.

Charles Clements, the former teacher colleague of plaintiff in the House Springs school district, testified that plaintiff and the child came to live with them at the time of the separation for about one or two weeks, at which time he observed that the child could not go to the bathroom without aid or take a bath by herself, and that she wanted to eat nothing but sweets; that during that time there was some improvement, and that later he had an opportunity to observe the child and that she now goes to the bathroom alone and takes her own bath, and dresses herself.

Mrs. Carl Strieder testified that plaintiff and his daughter have been living in her home since the first of August following the separation and that when the child came to live in her house she was unable to go to the bathroom herself, unable to undress herself or dress herself and would eat nothing but sweets; and that after five months the child never asked for cookies or sweets except after meals, was able to dress herself and undress herself, go to the bathroom, and has learned to play with other children. The witness testified that the plaintiff washed and ironed the child's clothes, and that the child waited for her father at the window each evening for him to return. Mrs. Strieder further testified that the child had an hysterical fear of having her hair washed when she came to live with her, but that now she has adjusted and loves to have her hair washed.

Evall Himmelman testified that he lived four doors from the parties' house in House Springs, and that he observed defendant out in the yard with the child, and that defendant would never let the child out of the yard or allow her to play with anyone else.

Harry Carbe, who maintained a summer home near the residence of the parties, testified that on week-ends he observed that the little girl was never permitted to play with his grandchildren.

Defendant's evidence was to the effect that she has been a housewife during her married life and that plaintiff would occasionally be gone from the home in the evenings, although she admitted that he engaged in extensive civic activity and that evening duties were required of him as a teacher.

Defendant-appellant charges plaintiff with drinking alcoholic beverages and staying out late hours. On cross-examination defendant testified she was trying to reconcile with the plaintiff since he left the home, and vacillated as to whether she wanted a divorce.

After the separation plaintiff brought the child back to visit the defendant some twenty-one or twenty-two times before the date of trial, December 27, 1962. On March 6, 1963, judgment was entered and defendant appealed.

Defendant claims that the trial court first erred in granting the husband a divorce because there was no evidence to show (a) misconduct of the defendant, and (b) plaintiff's freedom from misconduct.

■ Most of the testimony of plaintiff relating to defendant's acts was denied by the defendant, and plaintiff denied defendant's accusations. The evidence being in such a state of confliction, we are constrained to pay great deference to the findings of the trial court, who was in a position to hear and view the witnesses. Mayor v. Mayor, Mo.App., 351 S.W.2d 810; Harwell v. Harwell, Mo.App., 355 S.W.2d 137.

■ Plaintiff's evidence, if believed, establishes clearly that defendant's conduct was such that it demonstrated a course of conduct amounting to a species of mental or physical cruelty. Defendant's unfounded accusations and suspicions directed at plaintiff, and in some instances in front of the child, illustrate that type of action which justifies the trial court's judgment.

We find that this same conflict in oral testimony applies to defendant's accusations as to plaintiff's misconduct of drinking and staying out late. This testimony was temporized by defendant's own evidence admitting that plaintiff's activities in civic affairs and extra-curricular duties as a teacher required him to be away from home many times in the evening. The drinking accusation against plaintiff rested solely in defendant's testimony. We rule this point against defendant.

■ Defendant next complains of error in that the trial court refused to grant her judgment on her cross-bill for divorce. Obviously, this point is ruled by our ruling on the previous point, and defendant's further complaint of error on the part of the trial court in not granting alimony to defendant is likewise resolved.

■ Defendant's next assignment is that the trial court erred in awarding custody of the minor child to the husband. She argues that the child, being five years of age and a female, better belongs with her because the father improperly took the child from her home and has been required to place the child with baby sitters during the working day. Defendant further maintains that she has not been shown to have neglected her child.

■ We come now to the important task of examining the trial court's decision in granting the custody of this female child exclusively to the husband. There being no absolute rule, we must resort to the facts in this particular case.

In Tootle v. Tootle, Mo.App., 329 S.W.2d 218, Judge Broaddus of the Kansas City Court of Appeals stated, most clearly and forcefully:

"There is no absolute rule by which it can be determined which of the two

contesting parents is entitled to the custody of a child upon their separation, but each case must be judged on its own facts 'and in determining where the custody of a child shall go, the acts and attitude of the parents toward each other, the causes leading to the divorce, their treatment of each other, and similar matters, are all material and admissible in evidence as bearing upon the question of the fitness of the respective parents to have the custody of their child.' Meredith v. Krauthoff, 191 Mo. App. 149, loc. cit. 170, 177 S.W. 1112, loc cit. 1120. If anyone asserts that the question has not been a difficult one for the courts, let him but read the graphic language which appears in the opening paragraph of the much cited Krauthoff case. Usually the custody of children is awarded to the party who prevails in the divorce action. Wells v. Wells, Mo.App., 117 S.W.2d 700; Wilson v. Wilson, Mo. App., 260 S.W.2d 770, 776. Our courts have said that 'all things being equal', a child of tender years should be given into the custody of the mother. Keith v. Keith, Mo.App., 95 S.W.2d 669, 672. But the 'guiding star' which the courts must follow in determining the question of custody is the welfare and best interests of the child. There is an additional well settled rule 'that the findings of the trial court in matters involving the custody of a minor child of divorced parents, while not binding upon the appellate court which must review the record for itself, are nevertheless not to be lightly disturbed, and will be deferred to unless the appellate court is firmly convinced that the welfare of the child requires some other disposition.' Lutker v. Lutker, Mo. App., 230 S.W.2d 177, 179."

See Harwell v. Harwell, supra; Mayor v. Mayor, supra; and Ragan v. Ragan, Mo. App., 315 S.W.2d 142.

Under the facts of this case we cannot conclude that the best interests of the child would be served by any other disposition than that made by the trial court. Much of the evidence involving defendant's misconduct was inextricably interlaced with facts directly involving the child and acts committed in the immediate presence of the child. We cannot but hold that many of defendant's acts which gave grounds for divorce also directly and immediately affected the child's welfare. Certainly, the evidence supports the finding that the father has demonstrated the willingness and ability to provide the stable and protective climate for the child's development. The evidence shows that he voluntarily brought the child to visit the defendant some twenty-one or twenty-two times before the date of hearing, in a period of some five months.

The evidence shows the child's progress from a condition of uncertainty to one of well-adjustment and balance. Under these facts, we cannot hold the trial court was not justified in awarding the child's custody to the plaintiff.

■ Defendant's remaining assignment preserves nothing for review, in that she complains the court erred in "admitting incompetent, irrelevant, and immaterial evidence" without specifying how this generalized allegation related to any action or ruling of the court, in violation of V.A. M.R. 83.05(e). Lane v. Nixon, Mo.App., 326 S.W.2d 418.

Accordingly, the trial court's judgment is affirmed.

WOLFE, Acting P. J., and ANDERSON, J., concur.

RUDDY, J., not participating.