Thomas Brandon ROBERTS and Cara
Lee Roberts, Plaintiffs–
Respondents,

v.

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY,
Defendant–Appellant.

Nos. 25960, 25961.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 21, 2004.

John L. Mullen, Nikki Cannezzaro, Kansas City, MO, for appellant.

Robert W. Stillings, Springfield, MO, for respondents.

JEFFREY W. BATES, Chief Judge.

On July 21, 1997, Thomas Roberts ("Thomas") and Cara Roberts ("Cara") were passengers in a 1997 Camero being driven by Chad Campbell ("Campbell") on Highway 65 north of Branson, Missouri.[1] The car was involved in a high-speed automobile crash, killing Campbell and causing serious injuries to Thomas and Cara.

The Camero was owned by Reliable Chevrolet, Inc. ("Reliable"). Reliable had obtained liability, uninsured motorist and other insurance coverages on the Camero through a policy issued by Universal Underwriters Insurance Company ("Universal"). At the time the automobile accident occurred, Thomas and Cara resided with their mother, Patricia Roberts. She had a policy of automobile insurance issued by Progressive Northwestern Insurance Company ("Progressive") that covered the three vehicles she owned. The policy included uninsured motorist coverage on each vehicle with limits of $25,000 per person and $50,000 per accident.

Thomas and Cara submitted claims to Universal alleging their personal injuries had been caused by Campbell's negligent operation of the Camero. Universal issued a written denial of liability coverage for these claims. Thereafter, Thomas and Cara submitted claims for uninsured motorist benefits to Progressive. Progressive denied it owed Thomas or Cara any uninsured motorist benefits, which resulted in separate lawsuits being filed by each claimant against Progressive.

While the Progressive lawsuits were pending, Thomas and Cara settled claims for uninsured motorist benefits they had asserted against Universal. As a part of these settlements, Thomas and Cara each signed a document releasing Universal, Reliable, Campbell and others from any further liability. These releases, however, preserved Thomas' and Cara's uninsured motorist claims against Progressive.

After a consolidated trial in July 2003, Thomas and Cara each obtained a judgment against Progressive in the amount of $75,000 on their uninsured motorist claims. Progressive appealed from both judgments, and the appeals have been consolidated in this Court. Progressive challenges the judgments against it on two grounds. First, Progressive argues each judgment is against the weight of the "admissible" evidence because "there is insufficient evidence from which the court could conclude that Chad Campbell had implied permission of Reliable Chevrolet to use the vehicle as any such evidence was improperly considered by the court...." Second, Progressive argues Thomas' and Cara's

---

1. Because Thomas and Cara are siblings and share the same surname, we refer to them by their first names for purposes of clarity and convenience. We intend no disrespect.

uninsured motorist claims were void as a matter of law because the releases they signed did not preserve Progressive's right of subrogation. Additional facts necessary to our analysis of the case are included below as we address Progressive's two points on appeal.

## Standard of Review

In this court-tried case, our review is governed by Rule 84.13(d).[2] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Ridgway v. TTnT Development Corp.*, 126 S.W.3d 807, 812 (Mo.App. 2004).[3] The trial court's judgments are presumed correct, and Progressive has the burden of proving them erroneous. *See Wingate v. Griffin*, 610 S.W.2d 417, 419 (Mo.App.1980). We review the evidence and all reasonable inferences in the light most favorable to the judgments and disregard all contrary evidence and inferences. *Arndt v. Beardsley*, 102 S.W.3d 572, 574 (Mo.App.2003). Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses. *Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 86 (Mo.App.2003). We defer to the trial judge's superior opportunity to assess the witnesses' credibility. *Harris v. Lynch*, 940 S.W.2d 42, 45 (Mo.App.1997).

## *Point I—Admission of Hearsay Statements Concerning Implied Permission*

■ Progressive's first point on appeal attempts to present a challenge to the admission of "evidence"—otherwise undescribed—on the issue of implied permission that Progressive says the trial court improperly considered. This point relied on states:

> The trial court erred in entering judgment in favor of Cara and Thomas Roberts because the judgment was against the weight of the admissible evidence in that the unequivocal evidence established that it was Reliable Chevrolet's express policy to forbid employees such as Chad Campbell from using company vehicles and there is insufficient evidence from which the court could conclude that Chad Campbell had implied permission of Reliable Chevrolet to use the vehicle as any such evidence was improperly considered by the court and therefore Cara Roberts and Thomas Roberts' uninsured motorist claims are excluded from coverage by operation of Progressive's permissive-use exclusion.

In the argument following this point, Progressive states that "[d]uring the trial of this matter, the Roberts presented testimony from Cara Roberts regarding hearsay statements of Chad Campbell.... It is clear from review of the Trial Court's Findings and Order that the Court took into consideration these hearsay statements.... Therefore, the issue of the admissibility of these hearsay statements must be addressed." We are unable to determine from Progressive's brief what statements by Campbell were actually admitted during Cara's testimony. The statements were not set out in Progressive's statement of facts or argument, and no specific page references were provided

---

**2.** All references to rules are to the Missouri Rules of Civil Procedure (2004).

**3.** *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

to identify where such statements could be found in the transcript. *See* Rule 84.04(i). After reviewing Progressive's point relied on and corresponding argument, we conclude this evidentiary issue has not been preserved for appellate review.

The disposition of this point is controlled by Rule 84.04, which states, in pertinent part, as follows:

Where the appellate court reviews the decision of a trial court, each point shall:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: 'The trial court erred in [identify the challenged ruling or action], because [state the legal reasons for the claim of reversible error], in that [explain why the legal reasons, in the context of the case, support the claim of reversible error].'

Rule 84.04(d)(1). Progressive's first point relied on meets none of these requirements.

First, the point fails to identify the ruling challenged on appeal: the trial court's admission of Cara's testimony concerning statements made to her by Campbell. *See Eagleburger v. Emerson Elec. Co.,* 794 S.W.2d 210, 221 (Mo.App.1990); *State v. Hulsey,* 557 S.W.2d 715, 716–17 (Mo.App. 1977); *Beasley v. Hull,* 400 S.W.2d 423, 425 (Mo.App.1966); *Jennings v. Jennings,* 379 S.W.2d 159, 163 (Mo.App.1964).

Second, the point fails to state the legal reason for the claim of reversible error: that such testimony was inadmissible hearsay. *Richmond v. Springfield Rehab &* *Healthcare,* 138 S.W.3d 151, 154 (Mo.App. 2004); *In Interest of T.B.,* 963 S.W.2d 252, 256 (Mo.App.1997); *Hulsey,* 557 S.W.2d at 716–17.

Third, the point fails to explain why, in the context of this case, the legal reasons that support the claim of reversible error: e.g., Cara's testimony concerning what she was told by Campbell is hearsay because it was offered for the truth of the matter asserted, it was not within any allowable exception to the hearsay rule, and it was prejudicial because the trial court relied upon this testimony in finding that Campbell had Reliable's implied permission to use the Camero. *Warren v. State,* 2 S.W.3d 128, 130 (Mo.App.1999); *Tripp v. Harryman,* 613 S.W.2d 943, 950 (Mo.App. 1981); *State v. Davis,* 556 S.W.2d 745, 747–48 (Mo.App.1977).

The Western District of this Court addressed this same issue in the case of *In Interest of T.B.,* 963 S.W.2d 252 (Mo.App. 1997), which we find to be directly on point:

In her third Point Relied On, Mother attacks the sufficiency of the evidence, claiming that the Juvenile Officer failed to show by clear, cogent, and convincing evidence that the alleged abuse or neglect had occurred. She appears to be arguing that, considering all of the evidence, the evidence just did not support the judgment. Review of the argument portion of the brief reveals, however, that Mother is really arguing that the trial court erroneously admitted hearsay evidence and that without this evidence, there would not have been sufficient evidence to support the judgment. Because this argument was not made in the Point Relied On—the latter does not even mention hearsay—it is not preserved for review.

*Id.* at 256.

Progressive did raise the hearsay issue in the argument portion of its brief,

but that was not sufficient to preserve the matter for review. The only issues required to be determined on appeal are those raised in the points relied on. *State v. Henderson,* 954 S.W.2d 581, 586 (Mo. App.1997); *State v. Talbert,* 873 S.W.2d 321, 323 (Mo.App.1994). Issues first raised in the argument portion of the brief are not preserved for review. *Murphy v. Director of Revenue,* 136 S.W.3d 141, 145 n. 3 (Mo.App.2004); *American Family Mut. Ins. Co. v. Nigl,* 123 S.W.3d 297, 303 n. 2 (Mo.App.2003).

Although Progressive's first point is not preserved for review, Rule 84.13(c) allows this Court, in its discretion, to consider plain errors affecting substantial rights if manifest injustice or miscarriage of justice resulted therefrom. *Skalecki v. Small,* 976 S.W.2d 566, 569 (Mo.App.1998). *Ex gratia* review under the plain error standard reveals no basis for appellate relief.

In *State Farm Mut. Auto. Ins. Co. v. Foley,* 624 S.W.2d 853 (Mo.App.1981), Randy Blew was driving a Chevrolet in which Paula Blew was riding as a passenger. When the Chevrolet collided with another vehicle, Randy was killed; Paula was injured. The Chevrolet was owned by Mike Buck and was insured by State Farm. *Id.* at 854. Randy owned another vehicle which was insured by Cameron Mutual. The Cameron Mutual policy covered Randy's use of any automobile which he operated with the owner's permission. *Id.* A declaratory judgment action was filed after the accident. In that lawsuit, Cameron Mutual took the position that there was no coverage because Randy was not operating the Chevrolet with the Mike's permission. *Id.* at 855. At trial, Paula was allowed to testify, over Cameron Mutual's hearsay objection, about statements Randy made to her before and during their ride in the Chevrolet that tended to show Randy had Mike's implied permission to operate the vehicle. *Id.* at 858.

The trial court concluded that Randy did have implied permission from Mike to operate the Chevrolet. On appeal, Cameron Mutual argued the trial court committed reversible error in admitting Paula's testimony. The Western District held Randy's statements were admissible under the "state of mind" exception to the hearsay rule:

In the instant case the statements made by Randy show a design or plan to drive the car with Mike's permission. They demonstrate Randy's existing state of mind during the ride. They were made to his sister "in a natural manner and not under circumstances of suspicion." In his findings of fact and conclusions of law, the trial judge does not indicate that he relied on Paula's testimony in finding that Randy had Mike's "tacit" permission to drive the Chevrolet. He was, nevertheless, entitled to do so.

*Id.* at 858.

■ In the case at bar, whether Campbell had Reliable's implied permission to operate the Camero was one of the central issues to be determined. As *Foley* demonstrates, this presents a question as to Campbell's state of mind. Based on our independent review of the transcript, Campbell's statements to Cara tended to show a plan or design to operate the Camero (as well as numerous other cars belonging to Reliable) with the dealership's implied permission. Since the statements were relevant to Campbell's existing state of mind when the collision occurred on July 21, 1997, the trial court did not commit plain error by admitting them in evidence. Progressive's first point is denied.

*Point II—Effect of the Releases on Thomas' and Cara's Uninsured Motorist Claims Against Progressive*

In Progressive's second point on appeal, it argues the releases Thomas and Cara

gave to Universal when they settled their uninsured motorist claims against that carrier voided their uninsured motorist claims against Progressive as a matter of law. Further factual explication is required to resolve this point.

As noted above, Universal provided automobile insurance for the Camero. The policy issued to Reliable included liability and uninsured motorist coverages, among others. The uninsured motorist coverage had limits of $2,000,000 per occurrence. When Thomas and Cara initially submitted their personal injury claims to Universal, the carrier denied in writing that it provided any liability coverage or owed any duty to defend Reliable and/or Campbell. Thereafter, Thomas and Cara resubmitted their claims for consideration under Universal's uninsured motorist coverage. In an August 1999 letter to counsel for Thomas and Cara, Universal's attorney stated:

> Universal Underwriters, in conjunction with Progressive Insurance Company and Grinnell Mutual Insurance Company, has previously tendered to your clients a joint settlement offer. This was done in an effort to accomplish a global settlement and because Universal Underwriters recognized there might be coverage under the uninsured motorist portion of the policy. Universal Underwriters has steadfastly maintained that there is no liability coverage for your clients' claims pursuant to their policy of insurance. You have now agreed that there is no liability coverage, but have made a claim for uninsured motorist coverage. Grinnell and Progressive have now withdrawn their contribution to the overall settlement offer and are apparently resolving your clients' claims independent of a global settlement. Universal Underwriters hereby withdraws any joint settlement offer previously made and will negotiate independently with you with respect to your claims for uninsured motorist coverage.

A copy of this letter was sent to Progressive's attorney.

These negotiations resulted in a settlement of Thomas' and Cara's uninsured motorist claims against Universal on November 9, 1999. On that date, each claimant signed a document entitled, "RELEASE, TRUST AND SETTLEMENT AGREEMENT." Since both settlement agreements appear to be identical except as to the amount of the settlement and the name of the claimant, we draw further information solely from Cara's settlement agreement. After reciting that Cara had made a claim for uninsured motorist benefits against Universal, Progressive and Superior Insurance, her settlement agreement stated, in pertinent part, as follows:

> NOW, THEREFORE, in consideration of the compromise of the matters recited above, and for the sum of TWO HUNDRED THIRTEEN THOUSAND SEVEN HUNDRED AND NO/100 DOLLARS ($213,700.00) in uninsured motorist benefits, receipt of which sum is hereby acknowledged, Roberts hereby RELEASES AND FOREVER DISCHARGES Chad Campbell, Van Enterprises, Inc., Reliable Chevrolet, Inc., Universal Underwriters Insurance Company and Superior Insurance Company (hereinafter the "Released Parties"), their officers, directors, agents, servants, predecessors, successors, assigns, insurers, attorneys and all other persons, firms and corporations whomsoever, of and from any and all past, present or future claims, demands, obligations, actions, causes of action, personal injury claims, property damage claims, contractual claims, claims for bad faith or vexatious refusal, third party claims, loss of services claims, loss of consortium claims, survival actions and claims

for expenses and/or compensation of any nature whatsoever, whether based on a tort, contract, agency, vicarious liability or any other theory of recovery which Roberts now has or which may in any way arise out of or relate to (1) Roberts' Petition in the matter styled *Cara Lee Roberts v. Universal Underwriters Insurance Company,* Case No. 199CC2401, pending in the Circuit Court of Greene County, Missouri, and all related pleadings, (2) [Universal's] Petition for declaratory judgment in the matter styled *Universal Underwriters Insurance Company v. Van Enterprises, Inc., et al.,* Case No198CC4175, pending in the Circuit Court of Greene County, Missouri, and all related pleadings, or (3) any and all known or unknown claims in any way arising out of or relating to bodily and personal injuries or contractual claims, which have resulted or may result from any alleged acts or omissions of any of the Released Parties arising out of or in any way related to an automobile accident that occurred on or about July 21, 1997, in Christian County, Missouri, involving Roberts and Campbell. The parties acknowledge that this is a full and final release as to the Released Parties, but that Roberts specifically reserve all claims they may have as to Progressive Insurance Company or any others determined to be legally liable for the injuries sustained by Roberts.

Her settlement agreement also contains the following provision:

Roberts further stipulates and agrees that, to the extent of the payment of $213,700.00 made hereunder, she agrees to hold in trust and for the benefit of [Universal] all rights of recovery which she may have against any person or organization legally liable for her injuries. Roberts specifically assigns to [Universal] all proceeds of any settlement or judgment against such persons or organizations, up to the amount of $213,700.00. The amount held in trust and the specific assignment will be made to [Universal] from any judgment or settlement proceeds and will be paid over before any reduction or deduction for attorney's fees, costs or expenses.

Just prior to commencement of the trial, Progressive was given leave to file an amended answer asserting the following defense: "In further answer, defendant states that plaintiff waived his right to claim under defendant's policy by settling his claims with the responsible party without preserving defendant's right to subrogate." The trial court concluded that the specific reservation of the pending uninsured motorist claims against Progressive in the releases prevented Thomas' and Cara's uninsured motorist claims from being discharged as a matter of law.

■ On appeal, Progressive concedes that the releases signed by Thomas and Cara specifically and adequately preserved their uninsured motorist claims against it. Progressive argues, however, that "because Cara and Thomas Roberts did not preserve Progressive's right to subrogate, their uninsured motorist claims are void as a matter of law." This two-pronged argument is based solely on what Progressive describes as "the legal effect of the releases executed by Cara and Thomas Roberts."[4] We address each prong of the argument separately.

---

**4.** In Progressive's brief, it makes no argument that Thomas' and Cara's release of Campbell, Reliable and Universal as a part of the settlement of their uninsured motorist claims against that insurer violated any provision in Progressive's policy or that there is any contractual basis for avoiding its duty to pay

Progressive first contends Thomas' and Cara's settlement with Universal voided their uninsured motorist coverage with Progressive as a matter of law because Universal's policy included liability coverage, and liability claims were included within the scope of the releases. To support this contention, Progressive relies upon *Rister v. State Farm Mut. Ins. Co.,* 668 S.W.2d 132 (Mo.App.1984). In our view, *Rister* is factually distinguishable and does not support Progressive's position.

Ricky Rister, Bill Rister and George Rutledge were employed by Delta Paint and Drywall Company and were on their way to work in a pickup owned by Delta. Rutledge was driving the pickup, and Ricky was one of the two passengers. The pickup collided with a gasoline transport owned by Wisdom Oil Company, and both Rutledge and Ricky were killed. Rickey's wife and children instituted a wrongful death action against Wisdom, the driver of its transport truck and a defendant ad litem for Rutledge. *Id.* at 133.

Delta had obtained liability insurance coverage on the pickup through American Casualty Company. American denied its liability coverage applied to the collision because of a fellow employee exclusion in that coverage, but it did assume the defense of the tort action under a reservation of rights. Ricky Rister had two policies of personal automobile insurance with State Farm that provided uninsured motorist coverage. The State Farm policies defined an uninsured motor vehicle to include "a motor vehicle insured for bodily injury, but the insuring company denies coverage." *Id.* at 135. By amendment, the plaintiffs added State Farm as a defendant in the lawsuit in order to recover uninsured motorist benefits. *Id.* at 133–34.

On the morning of trial, the plaintiffs settled with Wisdom Oil Company. The case proceeded only against the defendant ad litem and State Farm. Near the end of the testimony, the plaintiffs reached a settlement with the defendant ad litem. American paid $35,000 from its liability coverage to settle the claim against Rutledge. Thereafter, plaintiffs obtained a judgment against State Farm for uninsured motorist benefits in the amount of $40,000. On appeal, State Farm argued that the pickup no longer qualified as an uninsured motor vehicle under the terms of State Farm's policy because American had unconditionally withdrawn its denial of coverage by paying $35,000 from its liability coverage to settle the claim against Rutledge. *Id.* at 134. This Court agreed with State Farm's argument:

> When a liability insurer, after an initial denial of coverage, extends an offer in settlement, it may be said it has only conditionally withdrawn its denial. However, when such an offer is accepted, the liability insurer no longer denies coverage. *In this case, when the $35,000 was offered and accepted, American Casualty no longer denied liability coverage. It paid $35,000 by reason of that coverage.* The plaintiffs were not entitled to recover upon the uninsured motor vehicle insurance in the State Farm policies.

*Id.* at 136 (emphasis added). Thus, it is clear in *Rister* that the settlement payment was made from American's liability coverage. This payment constituted an unconditional withdrawal of American's earlier denial that it provided *liability coverage* for the accident in which Ricky Rister was killed.

*Rister* does not aid Progressive because Universal's payments to Thomas and Cara

uninsured motorist benefits to Thomas and Cara.

were made from Universal's uninsured motorist coverage. The August 1999 letter from Universal's counsel to the attorney for Thomas and Cara demonstrates that the parties were negotiating a settlement of uninsured motorist claims. The settlement agreements reflect that Thomas and Cara were paid uninsured motorist benefits, and the total amount paid on their claims ($388,000) was well within the $2,000,000 uninsured motorist limit provided by Universal's policy. Moreover, each agreement included a provision requiring Thomas and Cara "to hold in trust and for the benefit of [Universal] all rights of recovery which either may have against any person or organization legally liable for [the claimant's] injuries. The Roberts specifically assign to [Universal] all proceeds of any settlement or judgment against such persons or organizations, up to the amount of [uninsured motorist benefits paid]."

A "trust" provision of the foregoing type is typically included in an agreement settling an uninsured motorist claim because § 379.203.4 gives an insurer a right of subrogation upon payment of uninsured motorist benefits to its insured.[5] *See State ex rel. Manchester Ins. & Indem. Co. v. Moss*, 522 S.W.2d 772, 775 (Mo. banc 1975); *Messner v. American Union Ins. Co.*, 119 S.W.3d 642, 646 n. 4 (Mo.App. 2003); *Schaeffer v. American Motorists Ins. Co.*, 973 S.W.2d 180, 182 (Mo.App. 1998); *Schreiner v. Omaha Indem. Co.*, 854 S.W.2d 542, 544 (Mo.App.1993); *Kroeker v. State Farm Mut. Auto. Ins. Co.*, 466 S.W.2d 105, 110–11 (Mo.App. 1971). The inclusion of such a trust provision would be inappropriate in a settlement agreement releasing a liability claim, on the other hand, because of Missouri's public policy prohibiting the assignment, in whole or in part, of a personal injury claim. *See Marvin's Midtown Chiropractic Clinic, L.L.C. v. State Farm Mut. Auto. Ins. Co.*, 142 S.W.3d 751, 754 (Mo.App. 2004); *Hays v. Mo. Highways & Transp. Comm'n*, 62 S.W.3d 538, 540 (Mo.App. 2001). The fact that the releases were broad enough to encompass other potential claims does not change the essential purpose of the settlement agreements: resolution of Thomas' and Cara's uninsured motorist claims with the settlement proceeds being paid from that coverage of Universal's policy. *Rister* simply has no application here because Thomas' and Cara's claims were not paid from the liability coverage of Universal's policy.

■ Progressive next contends Thomas' and Cara's settlements with Universal voided their uninsured motorist coverage with Progressive as a matter of law because it has been denied its right of subrogation. We begin our analysis by noting that in an action to enforce subrogation rights, the subrogee is neither a proper nor a necessary party; instead, he or she must sue in the name of the subrogor. *Kroeker*, 466 S.W.2d at 111; *see Manchester Ins. & Indem. Co.*, 522 S.W.2d at 775; *American Family Ins. Group v. Wilcoxson*, 572 S.W.2d 222, 224 (Mo.App.1978). "It is also well established that in such an action a party makes a claim through a derivative right acquiring no greater rights in law or equity than the party for whom it was substituted and therefore, cannot make a claim its subrogor could not make." *Stoverink v. Morgan*, 660 S.W.2d 743, 745 (Mo.App.1983). We agree that the settlement agreements executed by Thomas and Cara are broad enough to release their claims against the uninsured motorist, Campbell.[6] Citing *Dickhans v.*

5. All references to statutes are to RSMo (2000).

6. An insurer's right of subrogation extends only to the insured's claim against the unin-

*Missouri Property Ins. Placement Facility,* 705 S.W.2d 104 (Mo.App.1986), Progressive argues that "a release of the tortfeasor by the insured which destroys the insurers' subrogation rights bars the insured from recovering under the policy as a matter of law."

Under the circumstances presented here, we believe *Dickhans* is on point. The holding in this case, however, does not support Progressive's assertion that it is relieved as a matter of law of the obligation to pay Thomas and Cara uninsured motorist benefits. Instead, *Dickhans* stands for the proposition that, if Progressive does pay uninsured motorist benefits to Thomas and Cara in the future, it will retain whatever subrogation rights it may have against Campbell and Universal as his putative liability insurer.

In *Dickhans,* the Missouri Property Placement Insurance Facility ("MPPIF") provided casualty insurance for Dickhans' residence. The limit of coverage was $8,500. A car driven by Sanford collided with Dickhans' house and caused approximately $18,500 in damages. Dickhans reported the incident, which was covered by his casualty policy, to MPPIF. Sanford's auto was insured by Integrity, which provided property damage coverage up to a limit of $10,000. *Id.* at 105. In a letter to Integrity, an MPPIF adjustor told Integrity that MPPIF would pursue its right of subrogation against Sanford if called upon to pay Dickhans from the MPPIF policy. A few months later, Dickhans settled his claim against Integrity and Sanford for $9,750. As a part of the settlement, Dickhans signed an agreement releasing all of his claims against Integrity and Sanford. MPPIF then refused to pay the remainder of the loss. It argued, *inter alia,* that Dickhans had violated the conditions of his

policy because his settlement destroyed MPPIF's right of subrogation. *Id.* at 105–06. After the trial court granted summary judgment for MPPIF, Dickhans appealed. The Eastern District of this Court summarized the controlling legal principles in the following fashion:

> As a general rule when an insured, without the insurer's knowledge or consent, settles with and fully releases the tortfeasor so as to foreclose the insurer's right of subrogation, the insured violates his agreement with the insurer thereby precluding his right of recovery under the policy. However, this rule has no application where the third party tortfeasor is aware of the interest of the insurer and consents to a settlement with the insured for that amount over and above the amount which the insurer has paid or become obligated to pay. In such a case, the third party tortfeasor is held to have consented to the splitting of the cause of action against him and the potential of an unjust double recovery by the insured does not exist. On the other hand, it would be patently unjust to permit a third party tortfeasor, with knowledge of an insurer's subrogation interest, to settle with the insured for less than the wrongdoer's full liability, and become thereby insulated against the insurer's right of action against the tortfeasor.

*Id.* at 106 (citations omitted). The Eastern District reversed the summary judgment in favor of MPPIF because Integrity and Sanford were aware of MPPIF's subrogation interest and consented to the splitting of Dickhans' cause of action against Sanford by settling with him separately. *Id.* at 106. Since the settlement did not extinguish MPPIF's right of subro-

---

sured motorist. *Schaeffer,* 973 S.W.2d at 182; *Craig v. Iowa Kemper Mut. Ins. Co.,* 565

S.W.2d 716, 726 (Mo.App.1978); *Kroeker,* 466 S.W.2d at 110–11.

gation, Dickhans' right to recover benefits under his MPPIF policy was preserved.

*Dickhans* was followed by the Western District of this Court in *Marshall v. Northern Assur. Co. of America*, 854 S.W.2d 608 (Mo.App.1993). There, Carolyn Marshall was injured in an automobile accident caused by William VanDruff. He was insured by Farmers and only had liability coverage in the amount of $25,000 per person. The Marshalls had underinsured motorist coverage with Northern Assurance Company of America ("NACA"), and VanDruff qualified as an underinsured motorist under the terms of NACA's policy. The Marshalls obtained a judgment against VanDruff in the amount of $45,000. On the same day the judgment was entered, the Marshalls entered into a covenant not to garnish or execute on the assets of VanDruff in exchange for payment of his $25,000 limits. *Id.* at 609. Thereafter, NACA refused to pay, and the Marshalls filed suit to recover their underinsured motorist benefits. NACA contended the covenant not to garnish or execute against VanDruff's assets prejudiced NACA's subrogation rights so as to relieve the carrier of its duty to pay. The trial court entered summary judgment in favor of the Marshalls, and NACA appealed. The Western District affirmed the judgment in favor of the Marshalls. Relying upon *Dickhans*, the appellate court held as follows:

> It is obvious from the language of the covenant entered into between the Marshalls and VanDruff that VanDruff knew of NACA's interest. Therefore, we find that it would be "patently unjust" to allow VanDruff to enter into a covenant with the Marshalls limiting his own liability and thereby insulating himself against NACA's right of subrogation against him. Accordingly, we find that the covenant entered into between the Marshalls and VanDruff is not binding

on NACA. Therefore, the Marshalls did not breach their contractual obligation to protect NACA's subrogation right because that right still exists. Because the Marshalls have not breached their contract, NACA must perform under the contract. When NACA has paid the Marshalls pursuant to the underinsured provision of the insurance policy, NACA then will be entitled to attempt to recover from VanDruff any monies NACA has paid to the Marshalls because of the automobile accident that was the subject of the tort action.

*Id.* at 612. Thus, the settlement between the Marshalls and VanDruff did not destroy NACA's right of subrogation because the covenant not to execute was not binding on NACA. Consequently, the Marshalls' right to recover underinsured motorist benefits from NACA was not affected by the settlement.

We reach the same conclusion here. Prior to August 1999, there had been a joint effort by Universal, Progressive and Grinnell to settle Thomas' and Cara's uninsured motorist claims. On April 22, 1999, the attorney who jointly represented Progressive and Grinnell sent a letter to Universal's attorney. The letter stated:

> On behalf of Grinnell and Progressive, I am withdrawing our previous offer to contribute $10,000 from each carrier to settle all outstanding claims. Since your client has made little or no effort to get these cases settled, we will litigate the declaratory judgment action and defend the three UM cases which have been filed. If either of my clients are forced to pay any amounts on the underinsured [sic] motorist claims, I will fully pursue the subrogation claims.

In August 1999, Universal proceeded to negotiate an independent settlement of Thomas' and Cara's uninsured motorist

claims, and it apprised Progressive of the fact that such negotiations were being undertaken.

Once the negotiations were successfully concluded, settlement documents were prepared. Both settlement agreements note the Roberts have made or are making "claims for uninsured motorist insurance benefits from Superior Insurance and Progressive Insurance Company for damages as a result of the July 21, 1997, accident" and specifically reserve "all claims they may have as to Progressive Insurance Company...." These agreements, however, did not just release Thomas' and Cara's claims for uninsured motorist coverage against Universal. Instead, the documents also purported to release Thomas' and Cara's liability claims against Campbell. Universal was aware of Progressive's potential subrogation interest when the releases were signed, and the releases were broader than necessary to accomplish the goal of settling Thomas' and Cara's uninsured motorist claims against Universal. *See Schaeffer*, 973 S.W.2d at 182 (holding that an uninsured motorist carrier is only entitled to a release which makes it clear that the insured will make no further claim for uninsured motorist coverage relating to the accident giving rise to the claim).

Based on the holdings in *Dickhans* and *Marshall*, we conclude that it would be patently unjust to permit Universal, acting with knowledge of Progressive's potential subrogation interest, to purportedly extinguish that interest by settling Thomas' and Cara's uninsured motorist claims using release documents drafted so broadly as to discharge any liability claim against Campbell, the uninsured motorist. Based on the specific facts presented in the case at bar, we hold that the settlement documents signed by Thomas and Cara were ineffective to extinguish Progressive's potential right of subrogation against Campbell.

Since Campbell was killed in the collision that occurred on July 21, 1997, we also must address the collateral question of whether any effective procedural means exist by which Progressive can enforce any right of subrogation that will arise upon payment of uninsured motorist benefits to Thomas and Cara. We believe there is. Section 537.020.1 provides that a cause of action for personal injuries survives the death of the wrongdoer and may be asserted against his legal representatives. Section 537.021 states, in pertinent part, as follows:

1. The existence of a cause of action for an injury to property, for a personal injury not resulting in death, or for wrongful death, which action survives the death of the wrongdoer or the person injured, or both, shall authorize and require the appointment by a probate division of the circuit court of:

. . . .

(2) A personal representative of the estate of a wrongdoer upon the death of such wrongdoer; provided that, if a deceased wrongdoer was insured against liability for damages for wrongdoing and damages may be recovered from the wrongdoer's liability insurer, then the court in which any such cause of action is brought shall appoint at the request of the plaintiff or other interested party a qualified person to be known as a defendant ad litem. The defendant ad litem when so appointed shall serve and act as the named party defendant in such actions in the capacity of legal representative of the deceased wrongdoer and such appointment and any proceedings had or judgment rendered in such cause after such appointment shall be binding on the insurer of such deceased wrongdoer to the same extent as if a personal representative had acted as the legal representative of such deceased wrongdoer in

such cause of action. Should the plaintiff in such cause of action desire to satisfy any portion of a judgment rendered thereon out of the assets of the estate of such deceased wrongdoer, such action shall be maintained against a personal representative appointed by the probate division of the circuit court and the plaintiff shall comply with the provisions of the probate code with respect to claims against decedents' estates. Nothing in this section shall be construed to permit a plaintiff in such cause of action to pursue other assets of a decedent's estate after the expiration of the time provided in section 473.444, RSMo.

Subject to exceptions not relevant here, § 473.444 provides that all claims against the estate of a deceased person which are not filed in the probate division or paid by the personal representative become unenforceable and time-barred one year following the date of the decedent's death, whether or not administration of the decedent's estate is had or commenced within such one-year period.

Our review of the record reveals no indication that a decedent's estate was opened after Campbell died. Neither do we find any indication that Thomas' and Cara's personal injury claims were filed with the probate division of the circuit court within one year after his death. Therefore, no judgment could be satisfied from any assets of Campbell's estate. *See* § 473.444; § 537.021.1(2). The latter statute, however, does authorize the appointment of a defendant ad litem "if a deceased wrongdoer was insured against liability for damages for wrongdoing and damages may be recovered from the wrongdoer's liability insurer...." This issue appears to remain unresolved since Universal dismissed without prejudice the declaratory judgment action it brought against Thomas, Cara, Progressive and others seeking an adjudication that its policy did not provide any liability coverage for the accident of July 21, 1997. Accordingly, there is a procedural mechanism by which Progressive can seek to recover any sums paid as uninsured motorist benefits to the extent, if any, that Universal's policy provides liability coverage.

In conclusion, the settlement agreements are not binding on Progressive insofar as these documents purport to release Thomas' and Cara's liability claims against Campbell. *Dickhans*, 705 S.W.2d at 106; *Marshall*, 854 S.W.2d at 612. Since the settlements did not impair Progressive's subrogation rights, it must comply with its contractual duty to pay uninsured motorist benefits to Thomas and Cara pursuant to the judgments entered below. Once those payments occur, Progressive will acquire the subrogation rights granted by § 379.203.4 and the terms and conditions of its policy. That will permit Progressive to pursue its subrogation claim by bringing suit in the names of Thomas and Cara against a defendant ad litem for Campbell. Any recovery in such a lawsuit, however, will be limited to the amount Progressive paid as uninsured motorist benefits. The releases executed by Thomas and Cara are binding on them as to any claim they might have had for damages in excess of the amounts paid to them by Progressive. *See Dickhans*, 705 S.W.2d at 106; *Marshall*, 854 S.W.2d at 612.

The judgments of the trial court are affirmed.

PARRISH, P.J., and SHRUM, J., concur.